772 F.2d 1140
 27 Wage & Hour Cas. (BN 548, 54 USLW 2146,
103 Lab.Cas. P 55,525,
6 Employee Benefits Ca 2129
 Rose M. HOLLAND; Jean H. Stallings; Walter Burlington,
Jr.; John C. Brooks, Commissioner of Labor of the
State of North Carolina, Plaintiffs,
and
Bill N. Slack; Jimmy W. Aheron; Carol Aldridge; Pamila B.
Apple; Carole Baggett; Thomas F. Bowden; Walter Brom;
Nellie B. Burwell; Elizabeth S. Canada; Gary L. Carter;
Irene Chandler; James J. Clifford; Linda S. Coble; James
A. Crawford; Ruth Dixon; Octavia M. Driver; Edmund
Foster; Richard C. Foy; Peggy A. Gerringer; Deville
Goodman; Ada R. Griffin; Delanor M. Hamby; Mildred R.
Hester; Evelyn H. Hilton; Peggy W. Hodge; Mary E. Hope;
Joseph J. Houston; Don Huffman; Jeff Hughes, Yvonnie B.
James; Melvin E. King; Norma M. Loy; Sara Copeland
Maness; Linda Mooneyham; Cora N. Moore; Virginia M.
Moore; Robert C. Moricle; Edna M. Murray; Faye F. Neese;
Gladys J. Oakley; Patricia G. Page; Daniel E. Perry;
Barbara P. Petty; P. Douglas Pierce; Betty Hornaday Ray;
Ruth S. Rich; Mary Darlene Rierson; Fred Brewer Roberts;
Ida B. Saul; William A. Seelman; Sylvia R. Shoe; Gladys
H. Shore; Frances Simmons; Mary Foust Stansell; Peggy P.
Stone; Sherman C. Summers; Frances B. Sykes; Barbara D.
Thompson; Ronald F. Tyree; Hazel P. Walker; Mary Lou
Whitfield; Rita P. Whitley; Sandra F. Wilson; Brownie A.
Wright; Elsie B. Young; Bettie J. Boswell; Debbie M.
Rascoe; Lemmer Sherdina Sellars; Jack T. Sullivan; Claude
O. Anders; Eva Barr; Margaret Brindle; Hoyt Cheek, Sr.;
Hubert Foltz; Clyde Jarrell; Robert Martin; Thelma
Martin; Leslie Morehead; Gerald Moretz; Alice Nelson;
Carolyn Rayfield; Daisy Rickey; Ethel Royal; Larry
Wright; William K. Anders; Merilla L. Barrier; Diane L.
Boehm; Henry M. Brown; Hilda K. Cox; Stephen E. Elmore,
Jr.; Richard L. Hall; William Jones; Paul M. King;
Robert E. May; William Robert Oman; Cecil A. Poff; John
W. Quick; Clifton Smith; Mary Smith; J. Clay Stiles, III;
Bobby S. Tew; Thurman A. Chriscoe; Roy F. Williamson;
Betty Albright; Nadine Albright; Boyce J. Asbill; Doris
S. Baughan; Larry C. Beane; Melodye Snow Beard; Susan
Beasley; Robert N. Blevins; Karen L. Boling; Wanda
Bowman; Linda B. Brady; Linda P. Bristow; David Brittain;
Marcella Jo Brittain; Mary R. Bullard; Betty S. Byrd;
Charles H. Byrd; George M. Byrum; Charles F. Cagle, Jr.;
Claude R. Cagle; Ann J. Campbell; Joe J. Cassett;
Kimberly Spoon Coats; Garland J. Cole; George C. Cole;
Ted Cooley; Clara M. Cox; Phyllis Ingold Cox; Cindy M.
Cranford; Tommy L. Cranford; Curtis L. Craven; Jackie
Nall Davis; Wayne L. Duggins; Nancy M. Ellison; Herman A.
Flynt; Cecil C. Gatlin; Earl Glover; Willard E. Gordon;
Rayford B. Grant; James L. Hammer; Donald L. Harshaw;
Larry Lee Highsmith; Tommy W. Hill; Kathryn Jeanette
Hogan; Carroll D. Hoyle; Sandra Hunsucker; Katherine R.
James; Linda Jordan Kennedy; Coy A. Kiser; Marilyn Hewitt
Knight; Robert N.W. Knott; Gaynell H. Ledwall; Marguerite
M. Lineberry; Shelby L. Logsdon; Marlene B. Lucas;
Barbara S. Miller; Juanita K. Moody; Grace H. McNeill;
Robert F. McWilliams; Susan B. Pack; Cathy D. Powers;
Betty M. Reeves; Van E. Rich; Edwin L. Ridge; Harry Rose;
Carol L. Savchak; Lenora C. Shaw; James W. Slaughter;
Bobby N. Smith; Mike S. Smith; Imogene N. Snider; John W.
Snider; Mary Edith Spoon; Jean A. Stafford; Mozelle A.
Stout; Harriett W. Summey; Brenda S. Thomas; Gerald D.
Thomas; Frances Freeman Tilley; Hazel S. Trogdon; Betty
C. Von Cannon; Myrle L. Walker; William Bullock; Eurika
Plummer; Terriel E. Wessinger, Jr.; Walter G. Williamson;
James L. Wilson, Jr.; Mildred C. York; Faye T. Yow; Brian
Dale Manuel; Raymond Claude Evans; A. Gene Heidel; Brenda
B. Herndon; Russell W. Herndon; Virginia H. Schulte;
Sandra G. Walker; Sharon G. Warren; Shirley W. Welch and
Roger Downs, Appellants
v.
BURLINGTON INDUSTRIES, INC.; Calvin A. Michaels; Charles
A. McLendon; Humberto L. Quintana; Appellees.
State of New York, Amicus Curiae.
 No. 84-2241.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 7, 1985.
Decided Sept. 3, 1985.
 
 Marion G. Follin, III, Greensboro, N.C., Tiare B. Smiley, Asst. Atty. Gen., Raleigh, N.C. (Michael K. Curtis, Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N.C., Lacy H. Thornburg, Atty. Gen., John C. Brooks, Com'r of Labor, Thomas A. Harris, Director Wage and Hour Div., Raleigh, N.C., on brief) for appellants/intervenor.
 McNeill Smith, Greensboro, N.C. (Ben F. Tennille, Smith, Moore, Smith, Schell & Hunter, Greensboro, N.C., on brief) for appellee.
 Robert Hermann, Sol. Gen., O. Peter Sherwood, Deputy Sol. Gen., Albany, N.Y., Carlin Meyer, Jane Lauer Barker, Andrew Schultz, Asst. Attys. Gen., Robert Abrams, Atty. Gen., New York City, on brief) for amicus curiae.
 Before HALL and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 WILKINSON, Circuit Judge:
 
 
 1
 Former employees of Burlington Industries, Inc. Socks and Hosiery Divisions brought suit seeking to recover severance pay allegedly due upon Burlington's sale of the divisions to Kayser-Roth Corporation. The court below granted summary judgment for defendant after finding that the severance pay policy at issue was subject to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1001 et seq., that ERISA preempted state law, and that Burlington's decision to deny severance pay was neither arbitrary or capricious. Finding no error in these holdings, we affirm.
 
 
 2
 * The 200 appellants were employees of Burlington's Socks and Hosiery Divisions on January 3, 1982, when Burlington sold the divisions to Kayser-Roth as going concerns. Pursuant to agreement with Burlington, Kayser-Roth offered employment to virtually all employees of these divisions, including appellants, who continued to work without interruption. The five employees not offered employment with Kayser-Roth received severance pay under the plan described below, and Burlington agreed to provide severance pay to any employee terminated by Kayser-Roth within six months of the transfer of ownership.
 
 
 3
 Burlington has maintained a severance pay plan for salaried employees since at least 1953. At the relevant time, the terms of the plan appeared in the company's Policy Manual, available to employees on request, and in the Salaried Employees' Handbook. The Handbook described the plan in general terms, providing that two weeks' to twelve months' severance pay would be available to "full time employees who involuntarily leave the company."[1] The Policy Manual discussed the plan in more detail. In addition to setting out payment schedules for severance pay based on an employee's age and length of service, the Manual established eligibility requirements for severance pay. The most relevant requirement was that of "job termination," said to include "terminations due to circumstances such as elimination or modification of operations or other job elimination due to bona fide organizational changes."[2]
 
 
 4
 Appellants sought severance pay under this plan when Burlington sold the divisions to Kayser-Roth, asserting that they were entitled to the pay because their jobs with Burlington were terminated, and that their immediate re-employment by Kayser-Roth was irrelevant under the plan. Burlington denied that it owed severance pay, contending that there had been no "job elimination" as required by the Policy Manual.
 
 
 5
 Appellants initially sought redress in North Carolina state court, relying on common law claims of breach of contract and estoppel and several state statutes, including the North Carolina Wage and Hour Act, N.C.Gen.Stat. Sec. 95-25.7. The action was removed to federal court on Burlington's petition that the claims arose under ERISA. The plaintiffs amended their complaint to assert further claims based on ERISA. The Commissioner of Labor of the State of North Carolina ("Commissioner") intervened.
 
 
 6
 On appeal, the Commissioner primarily argues that the severance pay plan is not covered by ERISA, and that ERISA does not preempt state law. On this score, he is joined by officials from ten states and the District of Columbia as amici curiae. The 200 individual appellants contend that the denial of severance pay violated ERISA.[3]
 
 II
 
 7
 The Commissioner, joined by amici, asserts that ERISA simply does not apply to Burlington's severance pay policy, and that such a plan is therefore governed solely by state law. We reject this contention, and hold that Burlington's severance pay plan falls within the provisions of ERISA as an "employee welfare benefit plan." Moreover, ERISA governs employer severance pay plans whether funded from general assets, as here, or from a special trust.
 
 
 8
 Congress enacted this complex legislation to federalize much of employee pension and benefit law. It characterized plans covered by ERISA as either "employee pension benefit plans," 29 U.S.C. Sec. 1002(2) or "employee welfare benefit plans," 29 U.S.C. Sec. 1002(1), both of which must comply with ERISA's reporting and disclosure requirements, 29 U.S.C. Secs. 1021-1031, and its fiduciary standards for management of plan assets, 29 U.S.C. Secs. 1101-1114. The former are subject to more stringent requirements than the latter, including the statute's vesting and funding requirements, 29 U.S.C. Secs. 1053, 1082. None of the parties contends that the severance pay provision qualifies as an employee pension benefit plan. Rather, the issue is whether it constitutes an employee welfare benefit plan or a mere "payroll practice"--as defined by Department of Labor regulations, 29 C.F.R. Sec. 2510.3-1--that falls outside the scope of ERISA.
 
 
 9
 The statutory language supports the designation of severance pay as an employee welfare benefit plan. Such plans, as defined in Sec. 3(1) of ERISA, 29 U.S.C. Sec. 1002(1), include:
 
 
 10
 [A]ny plan, fund or program ... maintained by an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) ... benefits in the event of ... unemployment ... or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).
 
 
 11
 Subsection (A) above refers to "benefits in the event of ... unemployment." The evidence in this case suggests that at least one purpose of the Burlington plan is to provide help for employees during periods of unemployment that follow the elimination of their jobs. This view of severance pay brings it within the definition of employee welfare benefit plan in Sec. 1002(1)(A) and thus within the ambit of ERISA. See Gilbert, 765 F.2d at 325; Jung v. FMC Corp., 755 F.2d 708, 710 n. 2 (9th Cir.1985); Petrella v. NL Industries, Inc., 529 F.Supp. 1357, 1361 (D.N.J.1982) ("Severance pay, which in general is intended to tide an employee over while seeking a new job, certainly could be considered an 'unemployment' benefit.")
 
 
 12
 Severance pay plans are also within the definition of 29 U.S.C. Sec. 1002(1)(B), which refers to 29 U.S.C. Sec. 186(c) for illustration of the types of benefits characterized as employee welfare benefit plans. Section 186(c)(6) describes "pooled vacation, holiday, severance or similar benefits" (emphasis added), and thereby brings such benefits within the meaning of employee welfare benefit plans. Other courts considering the issue have reached the same conclusion. See e.g., Gilbert, 765 F.2d at 325-26; Scott v. Gulf Oil Corp., 754 F.2d 1499, 1502 (9th Cir.1985); Petrella v. NL Industries, Inc., 529 F.Supp. 1357, 1361-62 (D.N.J.1982); Dependahl v. Falstaff Brewing Corp., 491 F.Supp. 1188, 1196 (E.D.Mo.1980), aff'd, 653 F.2d 1208 (8th Cir.); cert. denied, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384, sub nom. Dependahl v. Kalmanovitz, 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981); Pinto v. Zenith Radio Corp., 480 F.Supp. 361, 362-63 (N.D.Ill.1979), aff'd, 618 F.2d 110 (7th Cir.1980).
 
 
 13
 Department of Labor regulations promulgated under ERISA reinforce the conclusion that the effect of the reference to Sec. 186(c) "is to include within the definition of 'welfare plan' those plans which provide holiday and severance benefits and benefits which are similar." 29 C.F.R. Sec. 2510.3-1(a)(3) (emphasis added). The Commissioner's contention that the Secretary of Labor lacks authority to interpret the statute in this manner has been definitively answered by Congress through subsequent amendment to the statute. In 1980, Congress added the language found at 29 U.S.C. Sec. 1002(2)(B): "The Secretary may by regulation prescribe rules consistent with the standards and purposes of this chapter providing one or more exempt categories under which--(1) severance pay arrangements ... shall, for purposes of this subchapter, be treated as welfare plans rather than pension plans." This amendment, adopted after the Secretary of Labor had promulgated the regulations, effectively sanctioned these regulations by statute and provided that severance pay arrangements, whether treated as pension plans or welfare plans, would be subject to the Act.
 
 
 14
 We also reject the Commissioner's contention that Burlington's severance pay plan is not within ERISA because it is not specially funded. He argues that Sec. 186(c)(6) includes only funded plans because that section concerns money paid to a "trust fund" established for the purpose of "pooled vacation, holiday, severance or similar benefits." 29 U.S.C. Sec. 186(c) (emphasis added). The Department of Labor regulations interpreting the reference to Sec. 186(c), however, contain no limitation on the form of severance pay plans; the reference is to types of benefits that are to be covered by ERISA, whether in the form of trust funds or not. Scott, 754 F.2d at 1502. This is a reasonable interpretation of the statute, and one in which Congress has concurred by its 1980 amendments. The Second Circuit has also concluded that the interpretation reflected in the regulation is supported by the legislative history of the original enactment of ERISA. See Gilbert, 765 F.2d at 326.
 
 
 15
 The Commissioner further argues that the severance pay plan in this case is a "payroll practice" and not an employee welfare benefit plan according to the Department of Labor's own regulations. 29 C.F.R. Sec. 2510.3-1(b) defines payroll practice to include payments out of an employer's general assets of compensation on account of work performed (including overtime pay, shift premiums, holiday premiums, and weekend premiums), id. Sec. 2510.3-1(b)(1), or for periods of absence due to medical or psychiatric reasons, id. Sec. 2510.3-1(b)(2), vacation, holiday, military duty, jury duty, training, or sabbatical leave, id. Sec. 2510.3-1(b)(3). Here the Commissioner's argument is refuted by omission. The regulations simply do not include severance pay as a payroll practice and, in light of the authority described above, we see no reason to disturb the Secretary's categorization of severance pay as an employee welfare benefit plan. Payroll practices refer to general asset compensation during employment; severance pay, by contrast, occurs after termination of employment. Scott, 754 F.2d at 1503. The Scott court reasoned soundly that the greater "danger of default" on large and unanticipated severance obligations argued also for coverage under ERISA.
 
 
 16
 Though a major purpose of ERISA was to aid employees' knowledge and receipt of benefits, employees may, as here, urge that a particular policy is not within ERISA so that claims may be heard before state courts or questions of federal preemption of state statutes may be avoided. These desires, however understandable, do not give us license to avoid the scheme established by Congress. As detailed above, Congress determined as a matter of policy that severance pay benefits should be subject to ERISA. It mandated that severance pay plans be subject to the reporting and disclosure requirements of ERISA, 29 U.S.C. Secs. 1021-1031, so that employees would be aware of their benefits and better able to pursue them. The fact that employees may sometimes wish to forego these advantages of ERISA coverage in favor of arguably more generous state statutes does not allow us to escape the clear direction of Congress.
 
 III
 
 17
 The district court concluded that ERISA's regulation of severance pay preempted state regulation of the matter. The Commissioner urges us to reverse this holding, arguing instead that ERISA and state statutes such as the North Carolina Wage and Hour Act should coexist and independently monitor severance pay plans. We do not agree and hold that ERISA preempts the state law claims asserted in this case.
 
 
 18
 When considering preemption of state law, "our task is to ascertain Congress' intent in enacting the federal statute at issue." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983). In ERISA, Congress made its intent known in what has been called "the most sweeping federal preemption statute ever enacted by Congress." California Hospital Association v. Henning, 569 F.Supp. 1544, 1546 (C.D.Cal.1983). 29 U.S.C. Sec. 1144(a) preempts, with certain exceptions not relevant here,[4] "any and all state laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA.
 
 
 19
 In Shaw, 463 U.S. at 96-97, 103 S.Ct. at 2899-2900, the Supreme Court held that this language must be given broad effect: "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." The Court had previously noted that "[t]he only relevant state laws, or portions thereof, that survive this preemption provision are those relating to plans that are themselves exempted from ERISA's scope." Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 n. 20, 101 S.Ct. 1895, 1906 n. 20, 68 L.Ed.2d 402 (1981). "The pre-emption provision was intended to displace all state laws that fall within its sphere, even including state laws that are consistent with ERISA's substantive requirements. Metropolitan Life Insurance Co. v. Massachusetts, --- U.S. ----, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985).
 
 
 20
 A broad reading of the phrase "relates to" is consistent with the legislative history and policies behind ERISA. Congress rejected a narrower preemption provision, that would have preempted only state laws dealing directly with ERISA plans. See Shaw, 463 U.S. at 98-100, 103 S.Ct. at 2900-2902. Instead, "Congress legislated an ouster of all state laws relating to employee benefit plans." Dependahl, 653 F.2d at 1215. This broad preemption furthers a major policy objective of ERISA--uniformity in employee benefit laws. Congress realized that various state regulations of employee benefit plans had become a major concern to employers with plants, divisions, or employees scattered in numerous states, and a broad preemption provision was an integral part of ERISA's response to that concern. See Shaw, 463 U.S. at 99, 103 S.Ct. at 2901.
 
 
 21
 Given the unparalleled breadth of ERISA's preemption provision, we have no trouble concluding that the state actions at issue are preempted. The state law here essentially requires employers to pay wages due upon termination of employment, N.C.Gen.Stat. Sec. 95-25.7. Insofar as this statute is invoked in pursuit of benefits allegedly due under Burlington's severance pay plan, it "relates to" an employee benefit plan covered by ERISA. Preemption applies to a state cause of action under common law as well, for the state breach of contract and estoppel claims pose the same potential as the statutory cause of action for conflicting employer obligations and variable standards of recovery.[5] As in Gilbert, "the state law claims ... would determine whether any benefits are paid, and directly affect the administration of benefits under the plan." 765 F.2d at 327. ERISA and the policies underlying it require preemption.
 
 
 22
 The Commissioner attempts to escape this conclusion by invoking ERISA's definition of "state." ERISA, 29 U.S.C. Sec. 1144(c)(2), defines state to include "a state [and] any political subdivisions thereof ... which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans." The Commissioner asserts that North Carolina does not, in fact, regulate the "terms and conditions" of the plan, and therefore its statute is not "state" law for preemption purposes. Given the explicitly broad nature of ERISA preemption, we are not inclined to limit ERISA's coverage through a restrictive reading of this term. Even under a narrow interpretation, however, laws that, if given effect, would govern the very availability of benefits for particular individuals clearly regulate the "terms and conditions" of the plan. See Authier v. Ginsberg, 757 F.2d 796, 799, n. 4 (6th Cir.1985).[6]
 
 IV
 
 23
 Having concluded that ERISA governs the issues presented in this case, we must now determine whether Burlington properly denied the claims for severance pay presented by the individual appellants. In reviewing determinations of claim eligibility under ERISA, we employ an "arbitrary and capricious" standard. Berry v. Ciba-Geigy Corp., 761 F.2d 1003 (4th Cir.1985); LeFebre v. Westinghouse Electric Corp., 747 F.2d 197 (4th Cir.1984). See also, Wolf v. National Shopmen Pension Fund, 728 F.2d 182, 187 (3d Cir.1984); Moore v. Reynolds Metals Company Retirement Program for Salaried Employees, 740 F.2d 454, 457 (6th Cir.1984); Berg v. Board of Trustees, Local 705 International Brotherhood of Teamsters Health and Welfare Fund, 725 F.2d 68, 70 (7th Cir.1984); Short v. Central States, Southeast and Southwest Areas Pension Fund, 729 F.2d 567, 571 (8th Cir.1984). We hold that the denial of severance benefits to the appellants was not arbitrary and capricious in this case.
 
 A.
 
 24
 We see no reason to deviate from this circuit's "arbitrary and capricious" standard of review, despite the appellants' request that we do so. Appellants argue that the arbitrary and capricious standard should apply only where a formal trust fund is involved. Though many cases applying this standard to eligibility disputes do involve trusts, there is no reason to apply a different standard here. Where claim eligibility is involved, it is necessary to ensure that primary responsibility rests with administrators "whose experience is daily and continual, not with judges whose exposure is episodic and occasional," Berry, 761 F.2d at 1006. This objective holds true whenever consistent administration of a pension plan or welfare benefit plan covered by ERISA is at issue. Claim eligibility disputes, absent a finding that they have been resolved in an arbitrary and capricious manner, must remain with those who formulate and administer company plans and policies, whether formally trustees or not. Accord, Jung, 755 F.2d at 710-12; Sly v. P.R. Mallory & Co., Inc., 712 F.2d 1209, 1211 (7th Cir.1983). To vary the standard of judicial review for general asset welfare plans would only sow confusion in ERISA, which we decline to do.
 
 
 25
 Appellants next urge that we apply here the more stringent fiduciary standards normally reserved for review of trustees' management of trust assets. See Struble v. New Jersey Employee Welfare Trust Fund, 732 F.2d 325 (3d Cir.1984). In Struble, plaintiffs challenged the trustees' decision to reduce employer payments into an overfunded plan rather than to increase the level of benefits. The court applied strict fiduciary standards because "the gravaman of the ... complaint is not that the trustees have incorrectly balanced valid interests, but rather that they have sacrificed valid interests to advance the interests of non-beneficiaries." Id. at 333-34. In Struble, those affected by the trustees' action included all potential beneficiaries of the plan. Here, by contrast, one group among the many potential beneficiaries of a company plan dispute the denial of their claims, and the issue is not, as in Struble, whether the trustees "have sacrificed the interests of the beneficiaries as a class in favor of some third party's interests." Id. at 333 (emphasis added). Struble involved in essence a fund management dispute, to which strict standards normally apply, rather than a question of claim eligibility, as here. See also, Jung, 755 F.2d at 711 (distinguishing Struble ).
 
 
 26
 Finally, appellants argue that special circumstances may justify a less deferential application of the arbitrary and capricious standard than would normally obtain. In Blau v. Del Monte Corp., 748 F.2d 1348, 1353 (9th Cir.1984), the court intimated that a more stringent review might be warranted "when ERISA's provisions have been flaunted in ... a wholesale and flagrant manner." The evidence showed that the plan was "actively concealed" from employees, id. at 1352, and that the employer had failed to meet any of ERISA's procedural requirements. Accordingly, the court, though still applying the arbitrary and capricious standard, reviewed the actions in light of the "continuing procedural violations." Id. at 1354.
 
 
 27
 We have underscored in this circuit the application of a single standard of review to questions of claim eligibility. See Berry, 761 F.2d at 1006; LeFebre, 747 F.2d at 204, Horn v. Mullins, 650 F.2d 35, 37 (4th Cir.1981). We see no reason to vary the standard based on procedural violations indicating bad faith, for such situations can be adequately resolved under the traditional standard. Where procedural violations evidence a "wholesale and flagrant" flouting of ERISA, the actions of administrators will not be insulated from a finding of arbitrariness. We would approach the question, however, within the framework of the single, uniform standard to be applied to all claim eligibility disputes.
 
 B.
 
 28
 Applying this standard to the facts before us, we find nothing arbitrary and capricious in Burlington's denial of severance pay. "Where the language used by the employer in holding out the plan is open to a construction supporting denial of a claim, the court should see whether the choice of that construction is arbitrary and capricious." Jung, 755 F.2d at 711. Here, Burlington determined that there was no "job elimination" as required by the plan because appellants had remained continuously employed in the same jobs they held before the transfer of ownership. This construction, though not compelled by the plan's language, is certainly a reasonable one, especially when viewed in light of the goals of the plan.
 
 
 29
 Burlington presented evidence that the plan was primarily intended for employees who suffered a period of unemployment when they were involuntarily terminated from their jobs. Appellants argue that this purpose is refuted by the fact that the benefits did not end when a former employee found new work; this feature, they allege, shows that the plan was not a form of unemployment compensation but was instead a type of accumulated compensation for past services. This feature of the plan, however, could just as easily be attributed to the administrative convenience of avoiding the need to monitor former employees' status for up to twelve months. In any case, unemployment compensation was undoubtedly a major purpose of the plan. See Jung, 755 F.2d at 713; Sly, 712 F.2d at 1211.
 
 
 30
 Given this purpose, we find that Burlington's interpretation of the plan was reasonable. Though it is true that the appellants stopped working for Burlington and started working for Kayser-Roth, this change in employer could reasonably be said to fall outside the scope of "job elimination." The appellants never missed a day of work due to the transfer, and most continued in their same jobs without interruption. There was no time during which they were forced to go without income due to the sale of the divisions. Employees who were not hired by Kayser-Roth received severance pay in due course. Under these circumstances, the denial of severance pay benefits to the appellants was not arbitrary and capricious but was in fact a perfectly reasonable interpretation of Burlington's severance pay policy which courts may not replace with an interpretation of their own. LeFebre, 747 F.2d at 204-05.
 
 
 31
 Moreover, the facts of this case do not suggest a "wholesale and flagrant" flouting of ERISA procedures that would indeed evidence bad faith and arbitrary behavior on an employer's part. Whatever violations may have occurred do not approach the level of those in Blau. There, for example, the plan was actively concealed from the employees; here, a general statement of policy was given to every employee and a detailed description was available upon request. Moreover, the employer in Blau never informed employees of its decision to deny severance pay. By contrast, Burlington promptly informed appellants that severance pay was not available under its policy. In this context, we are unable to conclude that procedural violations indicate bad faith so as to render the decisions of Burlington arbitrary and capricious.
 
 V
 
 32
 We affirm finally the decision of the court below not to award injunctive relief against Burlington. Appellants alleged that Burlington discriminated against them for pursuit of legal remedies by refusing to consider them for reemployment. ERISA, 29 U.S.C. Sec. 1140, prohibits such behavior, and appellants sought injunctive relief against the practice. Though there is evidence that Burlington refused to consider appellants for reemployment for several months, no one was affected by this policy while it was in force. Moreover, a corporate directive was subsequently issued to forbid such behavior, and three plaintiffs were in fact reemployed by Burlington. Given these facts, we find that the court below did not abuse its discretion in denying appellants' request for injunctive relief.
 
 VI
 
 33
 We have considered the contentions of appellants and find that they were properly resolved by the district court. The judgment of that court is, accordingly,
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 The complete text of the Handbook provision stated:
 SEVERANCE PAY.
 The Company provides severance pay to full-time employees who involuntarily leave the Company. Pay ranges from two weeks to twelve months, based on the employee's age and length of continuous service with the Company. Fraud or other behavior deemed to be willful could disqualify an employee from receiving severance benefits.
 
 
 [2]
 Relevant portions of the Manual provided:
 I. Company Policy
 A. General--The Company makes payroll severance payments and vacation severance payments to eligible salaried employees who are terminated from the Company.
 B. Payments--Payroll severance payments are based upon tables contained in this policy....
 II. Application of Policy
 A. Payroll Severance--All regular full-time salaried employees who meet eligibility requirements are paid payroll severance.
 
 
 [1]
 Eligibility--Employees are eligible to receive payroll severance if they are regular full-time salaried employees who are involuntarily terminated from the Company. Eligibility requirements are:
 a. Job Elimination--This category consists of terminations due to circumstances such as elimination or modification of operations or other job elimination due to bona fide organizational changes.
 
 
 [3]
 An action arising out of these same facts was filed in the Southern District of New York. The Second Circuit recently affirmed the district court's findings that the plan was within ERISA and that state law was preempted. Gilbert v. Burlington Industries, Inc., 765 F.2d 320 (2d Cir.1985). The case was remanded for consideration of whether the denial of severance pay was arbitrary and capricious
 
 
 [4]
 The exceptions allow continued operation of state insurance, banking, and securities laws, 29 U.S.C. Sec. 1144(b)(2)(A), within limits defined by the statute, 29 U.S.C. Sec. 1144(b)(2)(B), (b)(6), and generally applicable criminal laws, 29 U.S.C. Sec. 1144(b)(4). The Commissioner does not assert any of these exceptions to ERISA's preemption
 
 
 [5]
 "ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans. Instead, Congress intended for the courts, borrowing state law where appropriate, and guided by the policies expressed in ERISA and other federal labor laws, to fashion a body of federal common law to govern ERISA suits." Scott, 754 F.2d at 1501-02 (citing cases)
 Any hope of uniformity in employer obligations would be lost were we to allow various states' common law governing these obligations to coexist with federal common law under ERISA. Under such a scheme, employers would not only be faced with dual requirements within a single state, but with different state requirements wherever they do business. ERISA surely contemplates a different result.
 
 
 [6]
 We reject the Commissioner's argument for a Tenth Amendment exemption from ERISA's preemption, see Garcia v. San Antonio Metropolitan Transit Authority, --- U.S. ----, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), or an exception based on the state's police power, effectively rejected in Gilbert, 765 F.2d at 327
 We further reject the appellant's reliance on Livernois v. Warner Lambert Co., Inc., 723 F.2d 1148 (4th Cir.1983). There the court resolved severance pay issues on state law grounds and noted that cases arising under ERISA were not pertinent and presented a different question. 723 F.2d at 1152-3, n. 6.